UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SUISMAN, SHAPIRO, WOOL, | : | |
| BRENNAN, GRAY, & GREENBERG, | : | |
| P.C., | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:04-CV-745 (JCH) |
| | : | |
| S. JOEL SUISMAN, | : | |
| ANDREW SHAPIRO, and | : | |
| SUISMAN & SHAPIRO, | : | |
| Defendants. | : | FEBRUARY 15, 2006 |

**RULING  RE: PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT [DKT. NO.  37]**

The plaintiff, Suisman, Shapiro, Wool, Brennan, Gray, & Greenberg, P.C., brings this suit for trademark infringement against the defendants, S. Joel Suisman, Andrew Shapiro, and Suisman & Shapiro, pursuant to the Lanham Act, 15 U.S.C. § 1125(a), the Connecticut trademark statute, Conn. Gen. Stat. § 35-11i et seq., the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a et seq., and Connecticut common law.  The plaintiff firm previously moved for a preliminary injunction on the basis of its complaint, which the court granted.  See Preliminary Injunction Order, 5/26/2004 [Dkt. No. 16].

The plaintiff now moves for summary judgment on all of its claims.  For the following reasons, the plaintiff's motion is GRANTED.

## I. FACTUAL BACKGROUND[1]

This dispute arises from the defendants' use of the name "Suisman & Shapiro,"
which the plaintiff firm contends violates its trademark and constitutes unfair
competition under federal and Connecticut law.  The plaintiff is a law firm of "long
standing reputation" in New London, Connecticut that has existed, in different corporate
forms, since the 1950s. Pl's Rule 56(a)(1) Statement, ¶ 1.   The plaintiff firm has 20-22
active attorneys.  Defs' Rule 56(a)(2) Statement, Disputed Issues of Material Fact, ¶ 7.
Defendants S. Joel Suisman and Andrew Shapiro are former members of the plaintiff
firm.  Suisman practiced law at the plaintiff from 1960 until 2004, and Shapiro practiced
law at the plaintiff from 1977 until 1981, and later maintained an office at the firm for
non-law firm business purposes.  They are also the sons of the founding named
members of the plaintiff firm.

The name of the plaintiff firm has changed from time to time as partners have
joined and left the firm.  Members of the firm are licensed to practice law outside of
Connecticut, the firm has represented a substantial number of out-of-state clients, and
the firm has been involved in multi-state legal transactions.

---

[1]For the purposes of the instant motion, the court accepts facts undisputed by the
parties as true and resolves disputed facts in favor of the non-moving parties, here the
defendants, where there is evidence to support their allegations.
    The plaintiff and the defendants both rely entirely on the record developed before
this court in the preliminary injunction hearing, as well as representations made in their
pleadings, in establishing the facts relevant to this dispute. See Fed.R.Civ.P.
65(a)(2)("[A]ny evidence received upon an application for a preliminary injunction which
would be admissible upon the trial on the merits becomes part of the record on the trial and
need not be repeated on the trial."); Chauvin International Ltd. v. Goldwitz, 927 F.Supp. 40,
46 n.17 (D.Conn.1996)(applying Rule 65(a)(2) to record in support of summary judgment).

The defendants do not dispute that, since at least 2001, the plaintiff firm has utilized the mark "Suisman Shapiro" in various forums.  The defendants also do not dispute that the firm has advertised under the name "Suisman Shapiro" since 2002.  At the preliminary injunction hearing, Andrew Brand, the president of the plaintiff firm, testified that, beginning in 1997, non-managerial staff at the firm began using "Suisman Shapiro" to identify the firm in answering the phone, and that, in 2001, "Suisman Shapiro" first appeared on the firm's letterhead and, in 2002, in advertising directed at the general public.  The plaintiff firm also introduced evidence demonstrating that, since 2000, the firm has owned the domain name "suismanshapiro.com."  The defendants point out that the plaintiff firm has not used "Suisman Shapiro" exclusively in describing itself; the 2004 Martindale Hubbell listing for the plaintiff firm utilizied the firm's full name.

The defendants also do not dispute that the plaintiff firm enjoys a good reputation, and that, since at least 2001, the good will enjoyed by the plaintiff firm has been associated with the name "Suisman Shapiro" and that other people in the legal community refer to the plaintiff firm as "Suisman Shapiro."  Until 2004, there was no law firm other than the plaintiff law firm in New London or Connecticut that was known as Suisman Shapiro.

In 2004, S. Joel Suisman left the plaintiff firm.  In the discussions relating to his circumstances of his departure, which had occurred over several years prior to his departure, Suisman indicated his intention that, if he were to leave the plaintiff firm, he would create a new legal practice with Andrew Shapiro under the name Suisman & Shapiro.  Specifically, a January 2004 letter from Suisman's counsel to a member of the

3

plaintiff firm regarding the terms of Suisman's departure stated that Suisman intended to begin a new legal practice with Andrew Shapiro that would be known as "Suisman Shapiro," and that the continued use of that name by the plaintiff firm was "not authorized by the Suisman and Shapiro families."  Prelim. Inj. Hrg., Ex 6.  In response, in early 2004, the plaintiff firm registered the name "Suisman Shapiro" with the Secretary of State of Connecticut.  After Suisman left the plaintiff firm, he followed through on his stated intention, establishing, with Andrew Shapiro, the law firm of "Suisman & Shapiro."  The defendants' law firm is located approximately ten blocks from the plaintiff firm in downtown New London.

The defendants, in establishing their new law firm, became listed with the local phone company as "Suisman & Shapiro."  The defendants also created stationery and fax cover sheets bearing the name Suisman & Shapiro.  See Prelim. Inj. Hrg., Ex. 16. In addition to the name of the firm, the stationery included a reference in the left margin, under the names of the members of the firm, to the fathers of the members of the new firm, who were the founding members of the plaintiff firm.  Id.  The left margin lists the employment history of the defendants' fathers.  The last two listings in the left margin read:

Law Offices of
Suisman & Shapiro
Partnership
1954-1957

became
Suisman, Shapiro, et al.
1957-2004.

Id.  According to the defendants, the stationery has not been utilized in communication

with anyone besides members of the plaintiff firm.

At the preliminary injunction hearing, the plaintiff firm submitted evidence of actual consumer confusion.  A representative of the local phone company testified that listings for the plaintiff and defendant law firms both appear on the company's database when "S-U-I-S" is entered into the directory assistance database, and that the listings are accompanied by a warning stating "STOP! SIMILAR LISTINGS– VERIFY DETAILS!!!." Prelim. Inj. Hrg. Tr., p. 19-20; Ex. 1.   The name "S. Joel Suisman" is also listed on the printout for the results of a search under "S-U-I-S," although without any warning about similarity accompanying the listing.  The representative also testified that it is the procedure for directory assistance operators, when similar listings are displayed, to ask the caller for more details regarding the party they are trying to reach, such as the address of the party.  Id.  If the caller is unable to provide such information, the procedure of the operator would be to give the caller both numbers.  Id. at 20-21.

In addition, the plaintiff firm produced the testimony of Tami Gervais, a secretary at the plaintiff firm, who testified that, on two occasions, she received calls from potential clients who had called directory assistance and were given the number for a different office.[2]  The plaintiff firm also introduced two emails that Gervais sent to

---

[2]The defendants have renewed their objection to the admissibility of Gervais's testimony on the basis of hearsay.  In ruling on the motion for a preliminary injunction, the court held that the testimony was admissible under Fed.R.Evid. 803(3) as evidence of consumers' state of mind and would be received for that purpose.  Telephonic Ruling on Prelim. Inj. Tr., 5/26/04, p. 14 [Dkt. No. 15].  The court continues to find that Gervais's testimony is admissible on that basis.  See Fun-Damental Too, Ltd. v. Gemmy Industries Corp., 111 F.3d 993, 1003-04)(2d Cir. 1997)(holding out-of-court statements offered to establish customer confusion are not hearsay).

members of the plaintiff firm regarding her conversations with the potential clients.[3]  In

the email dated May 7, 2004, Gervais wrote that the client "was confused" when she

called to reschedule an appointment because "information" had given the client the

number for Joel Suisman, with whom he had scheduled an appointment.  Prelim. Inj.

Hrg., Ex. 15.

Joel Suisman testified that he did not direct the telephone company to list his

firm as Suisman & Shapiro.  Prelim. Inj. Hrg. Tr., p 86.  He also testified that the

stationery submitted as evidence by the plaintiff firm was only a draft prepared by a

graphics designer, and that it had not been used in communications with anyone but

people at the plaintiff firm.  Id. at 88.  Suisman testified that the defendant firm has not

printed business cards or engaged in advertising.  Id. at 88-89.  In addition, he had only

performed legal services for preexisting clients and had not undertaken any new

matters for new clients.  Id. at 91.  Andrew Shapiro testified that the defendants did not

have any intention to trade on the name of the plaintiff firm.  Id. at 120.

The plaintiff firm filed this action and moved immediately for preliminary

injunctive relief in May 2004.  The court, following a hearing on the motion for a

preliminary injunction, enjoined the defendants from utilizing the name "Suisman &

Shapiro" and "any combination of Suisman followed by Shapiro by any connective such

---

[3]At the preliminary injunction hearing, the defendants objected to the introduction of the emails because the plaintiff firm was "making evidence for themselves."  Prelim Inj. Hrg. Tr., p. 79.  The court allowed the emails to be submitted as business records.  Id. However, reviewing the emails again, the court notes that they are not themselves hearsay as they are the statements of Gervais herself (although they contain hearsay admitted under the exception discussed in Note 2), and thus need not fit a particular hearsay exception to be admissible.

as ampersand, colon, slash mark, colon or symbol, or a spelling such as 'and,'" conditioned on the posting of a $50,000 bond by the plaintiff firm.  Prelim. Inj. Order, 5/26/04.  The plaintiff firm now moves for summary judgment, arguing, inter alia, that it is entitled to a permanent injunction as a matter of law as no genuine issue of material fact exists as to its assertion that the defendants' mark is likely to cause confusion in the minds of consumers.  In response, the defendants argue that the plaintiff firm is not entitled to a ruling as a matter of law as there is no risk of confusion between the names given the different practices of the two law firms, and that the individual defendants are entitled to use their surnames in naming their legal practice.

## II.    LEGAL STANDARD

Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Hermes Int'l v. Lederer de Paris Fifth Ave, Inc., 219 F.3d 104, 107 (2d Cir. 2000). The moving party bears the burden of showing that no genuine factual dispute exists. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994)). "A fact is 'material' for these purposes when it might affect the outcome of the suit under the governing law."  Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005)(quotation marks omitted).  When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

Once the moving party has met its burden, in order to defeat the motion the

nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986), and present such evidence as would allow a jury to find in his favor, Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).  A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a Summary Judgment Motion."  Lipton v. The Nature Company, 71 F.3d 464, 469 (2d Cir. 1995) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986)).  Additionally, a party may not rest on the "mere allegations or denials" contained in his pleadings.  Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); see also Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the Summary Judgment Motion are not credible).  Moreover, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Jeffreys, 426 F.3d at 554.

III.    **DISCUSSION**

    A.    **The Lanham Act Claim**

    The plaintiff firm has demonstrated that it is entitled to judgment as a matter of law on its infringement claim under section 43(a) of the Lanham Act.  15 U.S.C. § 1125(a). "Where the predicate facts are beyond dispute, the proper balancing of [the Polaroid] factors is considered a question of law."  Playtex Prods. v. Georgia-Pacific Corp., 390 F.3d 158, 162 (2d Cir. 2004).  "Summary judgment is appropriate where the undisputed evidence would lead only to one conclusion under the Polaroid test."  Sports

Auth. v. Prime Hosp. Corp., 89 F.3d 955, 960 (2d Cir. 1996)(internal quotation marks omitted).

> Section 43(a) of the Lanham Act provides that
>
> [a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading of fact, or false or misleading representation of fact, which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .shall be liable in a civil action . . . .

15 U.S.C. § 1125(a)(1)(A).  To succeed on a claim under section 43(a), a plaintiff must prove that "its mark is entitled to protection and, even more important, that the defendant's use of its own mark will likely cause confusion with plaintiff's mark."  Gruner + Jahr Printing and Pub. Co. v. Meredith Corp.  991 F.2d 1072, 1074 (2d Cir. 1993); Virgin Enterpr. Ltd. v. Nawab, 335 F.3d 141, 145-46 (2d Cir. 2003)(applying Gruner test to infringement claims for unregistered marks brought under 15 U.S.C. § 1125(a)). The court considers each prong of the Gruner test in turn.

    1.    <u>Entitled to Protection</u>

    The short name of the plaintiff firm, "Suisman Shapiro," although descriptive of individuals' surnames, has developed a secondary meaning entitling it to protection. Under the Lanham act, personal surnames are generally treated as descriptive terms that require a showing that they have acquired a secondary meaning before they are afforded protection.  See Pirone v. MacMillan, Inc., 894 F.2d 579, 582-83 (2d Cir. 1991)("[E]stablishing a particular term or symbol as a valid trademark "depends ultimately on its distinctiveness, or its 'origin-indicating' quality, in the eyes of the

purchasing public."); <u>Abraham Zion Corp. v. Lebow</u>, 761 F.2d 93, 104 (2d Cir. 1985);

J.Thomas McCarthy, <u>Trademarks and Unfair Competition</u>, § 13:2, at 13-4 (4th Ed.

2005) ("[S]ince personal names are not regarded as being inherently distinctive marks,

they can be protected as trademarks only upon proof that through usage, they have

acquired distinctiveness and secondary meaning.").  "Marks acquire secondary

meaning when the name and the business have become synonymous in the mind of

the public, submerging the primary meaning of the term in favor of the meaning as a

word identifying that business." <u>Pirone</u>, 894 F.2d at 583 (quoting <u>Abraham Zion</u>).

"Acquired distinctiveness, as opposed to inherent distinctiveness, refers to the

"recognition plaintiff's mark has earned in the marketplace as a designator of plaintiff's

goods or services." <u>Playtex</u>, 390 F.3d at 163.

  The undisputed evidence clearly indicates that "Suisman Shapiro" has acquired

a secondary meaning as a phrase referring uniquely to the plaintiff firm as a long-

standing provider of legal services based in New London, Connecticut that is distinct

from the individuals whose names appear in the name of the plaintiff firm.  The

defendants admit, in their Rule 56(a)(2) Statement,  that, at least since 2001, the legal

community has referred to the plaintiff firm as "Suisman Shapiro" and that the

reputation and good will that has accrued to the plaintiff firm over a considerable period

of time is associated with the name "Suisman Shapiro."  Defs' Rule 56(a)(2) Statement,

¶¶ 11-12 [Dkt. No. 57].  In addition, until 2004, no other firm in Connecticut was known

as "Suisman Shapiro."

  Moreover, the court takes judicial notice of the custom, at least in Connecticut, of

identifying law firms by the first two names in a firm's title when the firm's name includes

several individual names.  See Fed.R.Evid. 201.  Thus, although the full name of the

plaintiff firm has changed over time, and although the defendants have introduced

evidence demonstrating that the plaintiff firm is not known exclusively as "Suisman

Shapiro," this evidence does not dilute the meaning that "Suisman Shapiro" has

acquired as a mark referring uniquely to the plaintiff firm.  A reasonable fact finder could

reach no conclusion, on the basis of the undisputed evidence, other than that, in the

market for legal services in Connecticut, the mark "Suisman Shapiro" has become

synonymous with, and refers distinctly to, the entity that is the plaintiff law firm.

Accordingly, the plaintiff firm has demonstrated that the mark in question has, as a

matter of law, acquired secondary meaning and is entitled to protection under the

Lanham Act.

    2.    Likelihood of Confusion

    To prevail on its Lanham Act claim, the plaintiff firm must demonstrate that, as a

matter of law, the defendants' mark is likely to cause confusion in the minds of

consumers.  "The likelihood-of-confusion inquiry turns on whether numerous ordinary

prudent purchasers are likely to be misled or confused as to the source of the product

in question because of the entrance in the marketplace of defendant's mark."  Playtex,

390 F.3d at 161 (quoting Cadbury Beverages v. Cott Corp., 73 F.3d 474, 477-78 (2d

Cir. 1996)).  Likelihood of confusion is determined according to the familiar eight factor

test set forth by Judge Friendly in Polaroid Corp. v. Polarad Elecs. Corp., 287 F2d 492,

495 (2d Cir. 1961).  The factors are: (1) the strength of plaintiff's mark; (2) the similarity

of the parties' marks; (3) the proximity of the parties' products in the marketplace; (4)

the likelihood that the plaintiff will "bridge the gap" between the products; (5) actual

11

consumer confusion between the two marks; (6) the defendant's intent in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the relevant consumer group. <u>Playtex Products, Inc. v. Georgia-Pacific Corp.</u>, 390 F.3d 158, 162 (2d Cir. 2004)(citing <u>Polaroid</u>, 287 F.2d at 495); <u>see also</u> <u>Natural Organics, Inc. v. Nutraceutical Corp.</u>, 426 F.3d 576, 579 (2d Cir. 2005).   The court addresses each factor in turn.

        A)    <u>Strength of Mark</u>

"The strength of a mark refers to its ability to identify the source of the goods being sold under its aegis.  There are two components of a mark's strength: its inherent distinctiveness and the distinctiveness it has acquired in the marketplace." <u>Brennan's, Inc. v. Brennan's Restaurant</u>, 360 F.3d 125, 130 (2d Cir. 2004).  As a descriptive mark, "Suisman Shapiro" has a relatively weak claim to inherent distinctiveness.  <u>See</u> <u>id.</u> at 130 (describing "descriptive" marks as second weakest category in four categories of relative distinctiveness).

However, as discussed above, "Suisman Shapiro" has developed acquired distinctiveness through its exclusive use over time as a mark referring uniquely to the plaintiff firm in the market for legal services in Connecticut.  <u>See</u> <u>Virgin Enterprises Ltd v. Nawab</u>, 335 F.3d 141, 148 (2d Cir. 2003)("If a mark has been long, prominently and notoriously used in commerce, there is a high likelihood that consumers will recognize it from prior use.").  Having concluded that the plaintiff firm's mark has, as a matter of law, acquired secondary meaning sufficient to entitle it to protection, the court also concludes that no triable issue of fact exists with regard to the characterization of the strength of the plaintiff firm's mark as strong.   Therefore, this factor favors the plaintiff

12

firm.

The defendants argue that, because the mark in question designates the services of a law firm, rather than consumer goods, an inquiry into the strength of a mark should take into account other characteristics about the two marks being compared.  Defs' Memo. in Opp., p. 11.  They argue, somewhat conflating the first two factors of the Polaroid test, that the "source" of the services represented by the marks is "anything but anonymous" and "the similarity of the names does not prevent each firm from identifying its own services."  Id.

This argument is without merit for several reasons.  First, it is not uncommon or unusual to apply the first factor of the Polaroid test to a mark that designates a service provider rather than a consumer good.  See, e.g., Savin Corp. v. The Savin Group, 391 F.3d 439, 457 (considering the strength of marks owned by a business equipment seller); Brennan's, 360 F.3d at 130 (considering the strength of a restaurant's name). Second, the inquiry into the strength of a mark does not require a comparison of the two marks in question; it is an inquiry focused solely on the degree to which the senior mark is distinct in the minds of consumers.  See, e.g. Playtex, 390 F.3d at 163-64. That consumers could potentially distinguish, in their minds, two different law firms with similar marks but different characteristics, is not relevant to the degree to which consumers of legal services in Connecticut have come to associate the mark "Suisman Shapiro" with the plaintiff firm.  Consequently, the defendants have failed to demonstrate that a genuine issue of material fact exists with regards to the strength of the plaintiff firm's mark.

B)    Similarity of Mark

13

In considering this factor, courts look to "1) whether the similarity between the two marks is likely to cause confusion and 2) what effect the similarity has upon prospective purchasers." <u>Sports Auth.</u>, 89 F.3d at 961.  "[T]he crux of the issue is whether the similarity is likely to cause confusion among numerous customers who are ordinarily prudent." <u>Savin Corp.</u>, 391 F.3d at 458 (internal quotation omitted).

The defendants concede that the only distinguishing feature between the names used by the two law firms is the use, by the defendants, of an ampersand between "Suisman" and "Shapiro."  Defs' Rule 56(a)(2) Statement, ¶ 20.  While courts do not "look just at the typewritten and aural similarity of the marks, but how they are presented in the marketplace," <u>Sports Auth.</u>, 89 F.3d at 962, courts also "assess the degree of similarity between them in assessing the likelihood that consumers will be confused."  <u>Virgin</u>, 335 F.3d at 149.  The court finds that a reasonable fact finder could reach no conclusion other than that the marks are strikingly similar in appearance and likely, based on their similarity, to cause confusion in the minds' of consumers appraising the marks.  This conclusion is supported not only by the identical pronunciation, and near identical appearance of the marks, but also by the evidence concerning the confusion in the directory assistance database of the local telephone company, which constitutes a way in which the services of the two law firms are presented in the marketplace.  While a consumer may, as the defendants argue with regard to the first factor, eventually come to distinguish the two firms based on their different compositions and breadth of practice, the marks themselves are similar in all respects.  Accordingly, this factor weighs in favor of the plaintiff.

      C)    <u>Proximity of Parties' Products in Marketplace</u>

The proximity factor "focuses on whether the two products compete with each other.  To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion."  <u>Savin</u>, 391 F.3d at 458.  "The competitive proximity factor has two elements, market proximity and geographic proximity.  Market proximity asks whether the two products are in related areas of commerce and geographic proximity looks to the geographic separation of the products."  <u>Brennan's</u>, 360 F.3d at 134.  Courts consider whether "the two products compete with each other;" however, "direct competition between the products is not a prerequisite for relief."  <u>Sports Auth.</u>, 89 F.3d at 963.

It is beyond dispute that the plaintiff and defendant law firms are both geographically proximate and proximate in a market sense.  The defendants admit that their law firm is located ten blocks from the plaintiff firm in New London.  Defs' Rule 56(a)(2) Statement, ¶ 18.  The firms also compete within the same market for legal services in Connecticut and offer services that fall within the same general class and serve the same purpose, i.e., legal representation.

The defendants, citing <u>Buitoni Foods Corp. v. Gio Buton</u>, 680 F.2d 290 (2d Cir. 1982) for support, argue that the composition and practice of their firm is sufficiently different from that of the plaintiff firm such that the "products" of the two firms are not proximate.  <u>See</u> <u>id.</u> at 292 (finding lack of proximity where products "differ in ways that may be deemed material to consumers.").  Specifically, the defendants point out that the individual defendants are 1) both older men, 2) are "likely" to find clients "out of past relationships," and 3) lack the resources and depth of the plaintiff firm.  Defs' Memo. in

15

Opp., p. 11-12.  They argue that these facts suggest that the firms have "characteristics that are not interchangeable" and thus the firms do not actually compete with each other.  Id.  However, these differences are not material differences like those discussed by the court in Buitoni.  In that case, the Second Circuit found that the plaintiff's table wine was not proximate to the defendants' aperitifs and liqueurs as the products had different alcohol contents and different uses.  Id. at 292.  The differences between the plaintiff firm and the defendant firm could not be said to be material to consumers in the same sense as the differences between the products in Buitoni, as a consumer, who may ultimately take such differences into consideration when choosing a legal firm, would "consume" the legal representation of either firm in the same way.  Furthermore, the inquiry into market proximity is conducted from a more general perspective than the defendants suggest.  See Cadbury, 73 F.3d 474, 480 (2d Cir. 1996)(Courts "look to the nature of the products themselves and the structure of the relevant market.")(internal quotation marks omitted).  Therefore, the defendants have failed to demonstrate a genuine issue of material fact as to the proximity of the plaintiff and defendants firms, and the plaintiff is entitled to have this factor weighed in its favor.

        D)     Bridging the Gap

The question under this factor is typically the likelihood that the plaintiff will seek to enter the same market or business as the defendant.  See Savin, 391 F.3d at 469.  "The factor is designed to protect the senior user's interest in being able to enter a related field at some future time."  Id.  Having already concluded that the plaintiff and

16

defendants firms occupy the same market for legal services in Connecticut, this factor is not relevant in this particular Polaroid analysis.

The defendants argue that this factor weighs against the issuance of an permanent injunction as "there is little likelihood that Joel Suisman and Andrew Shapiro will develop a firm with the size and resources prized by clients" of the plaintiff firm. Defs' Memo. in Opp., p. 12.  In assessing this factor, however, courts only inquire into the possibility that the holder of the senior, rather than the junior mark, may enter the market of the junior, rather than vice-versa.  See, e.g. Sports Auth., 89 F.3d at 963.

E)    Actual Consumer Confusion

Actual confusion is "consumer confusion that enables a seller to pass off his goods as the goods of another."  Id. at 963.  "It is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion."  Virgin, 335 F.3d at 151.  In Virgin, an affidavit of a former mall kiosk employee of the defendant stating that individuals had asked him if the kiosk was affiliated with the plaintiff's stores was treated as evidence weighing in the plaintiff's favor.  Id.  Similarly, the testimony of Tami Gervais, the secretary of the plaintiff firm, regarding the two calls she received from potential clients who were given the number for the defendant firm by directory service is evidence of actual consumer confusion weighing in favor of the plaintiff.

The defendants do not dispute the substance of her testimony.  However, the defendants argue that Gervais's testimony does not establish anything other than that two callers out of the hundreds of calls received by the plaintiff firm each year

17

expressed uncertainty after receiving more than one phone number, and point out that both callers were able, in the end, to reach the plaintiff firm.  Defs' Rule 56(a)(2) Statement, Disputed Issues of Material Fact, ¶ 8.  While these assertions may be true and are probative of the weight that may be accorded to Gervais's testimony by a factfinder, Gervais's testimony as to her conversations remains evidence of actual confusion that weighs in favor of the plaintiff firm.

        F)    <u>Defendant's Good Faith</u>

This factor considers whether "the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between his and the senior user's product."  <u>Savin</u>, 391 F.3d at 460.  The good faith of a defendant, however, is not of "high relevance to the issue of likelihood of confusion" as it "does not bear directly on whether consumers are likely to be confused."  <u>Virgin</u>, 335 F.3d at 152.

The plaintiff firm has produced evidence, such as the defendants' draft letterhead, that would support an inference that the defendants, in choosing the name of their firm, intended to trade off of the reputation and goodwill of the plaintiff firm. The defendants, however, state that they did not have any bad faith intent in establishing and choosing the name of their law firm.  Defs' Rule 56(a)(2) Statement, Disputed Issues of Material Fact, ¶ 3.  The court notes that "subjective issues such as good faith are singularly inappropriate for determination on summary judgment." <u>Cadbury</u>, 73 F.3d at 483.  While the court cannot resolve this <u>Polaroid</u> factor as a

matter of law, this is not a close case in which a finding of bad faith or good faith on the part of the defendant is likely to "tip the balance" in considering all of the <u>Polaroid</u> factors together.  <u>See Virgin</u>, 335 F.3d at 151 ("A finding that a party acted in bad faith can affect the court's choice of remedy or can tip the balance where questions are close.").

        G)     <u>Quality of Defendant's Product</u>

     The Second Circuit has said, as with the bad faith of a defendant, that the quality of a defendant's product is not of "high relevance" to a determination of the likelihood of consumer confusion.  <u>Id.</u>  The parties have not produced evidence regarding the relative quality of the services provided by the two law firms, and the plaintiff has not made any assertions regarding the quality of defendants' legal work.  Given the nature of the dispute between the parties, this factor is not particularly relevant in the <u>Polaroid</u> analysis, and the court finds that it is of neutral weight.

        H)     <u>Sophistication of Relevant Consumer Group</u>

     In considering this factor, a court considers "the general impression of the ordinary purchaser buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods."  <u>Sports Auth.</u>, 89 F.3d at 965 (quotation marks omitted).  "As the theory goes, the more sophisticated the purchaser, the less likely he or she will be confused by the presence of similar marks in the marketplace."  <u>Savin</u>, 391 F.3d at 461.  "Where the purchasers of a products [sic] are highly trained professionals, they know the market and are less

19

likely than untrained consumers to be misled or confused by the similarity of different marks. . . . [R]etail customers . . . are not expected to exercise the same degree of care as professional buyers." Virgin, 335 F.3d at 151.

As a law firm with a broad practice, it is likely that the plaintiff firm attracts both sophisticated and unsophisticated purchasers of legal representation.  The plaintiff firm has introduced evidence suggesting that it actively pursues business from "retail" clients, such as individuals in need of one-time legal representation, in addition to its representation of more sophisticated clients such as institutions or other law firms.  The advertising submitted by the plaintiff firm that bears the "Suisman Shapiro" mark is aimed, for example at individuals in need of representation in the areas of criminal defense, personal injury, and divorce law.  Prelim. Inj. Hrg., Ex. 9.  These potential individual clients are not likely to know the difference between the parties' law firms simply by observing their different marks.  Moreover, the plaintiff firm introduced testimony, which the defendants do not dispute, that the plaintiff firm receives "hundreds" of calls from potential clients responding to advertising each year.  Defs' 56(a)(2) Statement, Disputed Issues of Material Fact, ¶ 8 (citing Prelim. Inj. Hrg. Tr., p. 51-52).  Thus, the undisputed evidence suggests that the relevant consumer group of the plaintiff firm's services contain a large number of unsophisticated purchasers of legal services.  Accordingly, as a matter of law, this factor weighs in favor of the plaintiff.

        I)     Balancing The Polaroid Factors

In balancing the eight Polaroid factors, a court "should not treat an single factor

as dispositive; nor should a court treat the inquiry as a mechanical process by which the party with the greatest number of factors wins." Playtex, 390 F.3d at 162.  Instead, a court focuses on "the ultimate question of whether consumers are likely to be confused."  Id. (internal quotation marks omitted).

In assessing the factors, the court has found that undisputed evidence supports the conclusion that the plaintiff's mark is strong; that the parties' marks are strikingly similar; that the parties' services are proximate both geographically and within the same market; and that the relevant consumer group contains at least a large number of unsophisticated consumers.  The plaintiff has also introduced uncontradicted evidence of actual consumer confusion.  Considering these factors, the court concludes that a reasonable fact finder could reach no conclusion other than that a likelihood of consumer confusion exists under the Lanham Act with regards to the parties' marks. Accordingly, the plaintiff is entitled to judgment as a matter of law on its Lanham Act claim.

**B)      Connecticut Unfair Competition Claim**

The plaintiff firm asserts a cause of action under Connecticut common law for unfair competition.  The Connecticut Supreme Court stated the standard for the tort of unfair competition in Shop-Rite Durable Supermarket, Inc. v. Mott's Shop Rite of Norwich, Inc., 173 Conn. 261 (1977):

> No flexible rule can be laid down as to what use of names will constitute unfair competition; this is a question of fact. The question to be determined is whether or not, as a matter of fact, the name is such as to cause confusion in the public mind as between the plaintiff's business and

21

that of the defendant, resulting in injury to the plaintiff. The test is whether the public is likely to be deceived.  If the court finds that the effect of appropriation by one corporation of a distinctive portion of the name of another is to cause confusion and uncertainty in the latter's business, injure them pecuniarily and otherwise, and deceive and mislead the public, relief will be afforded.  It is not sufficient that some person may possibly be misled but the similarity must be such that any person, with such reasonable care and observation as the public generally are capable of using and may be expected to exercise, would be likely to mistake one for the other."

Id. at 265-66 (quoting Yale Co-operative Corp. v. Rogin, 133 Conn. 564, 571 (1947)).

The court in Shop-Rite also held that, to be protected, a mark must "become in the

market the name for goods or services coming from or through a particular source or

the name for a particular business. This special significance, once acquired, is

thereafter its primary meaning in the market, though lexicographically it may have an

earlier, different meaning."  Id. at 266; see also Paindiris v. Situni, No. 704013, 1993

WL 343880, *2 (Conn. Super. Aug. 25, 1993)("Mere use of another's name is not

always sufficient . . . but a use in connection with a concern engaged in a business that

is in direct competition with the complainant, or in a closely allied business, is likely to

result in a confusion and deception of the public.").

In light of the analysis of the likelihood of confusion under the Lanham Act, the

plaintiff firm has established that it is entitled to prevail as a matter of law on its unfair

competition claim.   The mark "Suisman Shapiro" has acquired secondary meaning as a

name referring exclusively to the plaintiff firm in the market for legal services in

Connecticut.  As discussed above, a reasonable fact finder is compelled to find that the

marks are sufficiently similar, and the firms sufficiently proximate, such that a consumer

22

exercising reasonable care in selecting legal representation is likely to be misled by the name of the defendant firm into believing that it is affiliated with the plaintiff firm.  See Shop-Rite, 173 Conn at 267 (finding defendant's "Shop Rite" mark was misleading in comparison to plaintiff's "Shop-Rite" mark); Drain Doctor, Inc. v. Centiempo, No. CV 90-0439180S, 1991 WL 27940, at *2 (Conn.Super. Jan. 8, 1991)(finding "The Drain Doctor, Inc" and "Doctor Drain" misleadingly similar); Eye Asscs., P.C. v. Connecticut Eye Physicians & Surgeons, 662 F.Supp. 384, 388 (D.Conn. 1987)(finding that person exercising reasonable care in seeking eye care would likely mistake parties' practices given substantial similarity between names, noting confusion caused by proximity of names in phone book).  The evidence of actual confusion introduced by the plaintiff supports this conclusion as well.  See Shop-Rite, 173 Conn. at 267.

The defendants argue that, while the names of the parties' firms may lead to some consumers being misled, the consumers are nonetheless not likely to be deceived by the marks if they are exercising reasonable prudence, given the different characteristics of the law firms.  However, as discussed above, although trademarks are judged according to a reasonably prudent consumer standard, people in the market for legal services are not expected to know the characteristics of law firms to the degree suggested by the defendants.  See Paindiris, 1993 WL 343880, at *2 ("The law is not made for the protection of experts, but for the public– that vast multitude which includes the ignorant, the unthinking and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearances and general impressions.")

23

It is also appropriate here to address a strand of argument that runs throughout the defendants' pleadings in several different forms.  The argument, although never articulated exactly as such, is that the defendants have a "right" to use their surnames in naming their law firm (or, as suggested several times in the defendants' pleadings, a "right" to direct the use of the names of the defendants' fathers), or that there is something particular about the names of law firms that distinguish them from other marks that designate service providers.

There are several problems with the defendants' argument.  First, while law firms are commonly named according to the surnames of their partners, they, like many other service providers, trade on the basis of the goodwill that attaches to their mark over time, and their marks are equally deserving of protection.  As pointed out above, trademark disputes involving service providers whose marks contain personal surnames are not uncommon.  See, e.g., Savin Corp. v. The Savin Group, 391 F.3d 439, 457 (considering the strength of marks owned by a business equipment seller); Brennan's, 360 F.3d at 130 (considering the strength of a restaurant's name).  Second, at issue here is not simply the "right" to use a surname qua surname in establishing the name of a law firm; the issue is the use of surnames in a particular sequence in close proximity to a plaintiff who has developed an identity with a mark that is distinct from individuals who names comprise the mark.  The plaintiff firm has not sought to enjoin the individual defendants from practicing law in their own names, but only from utilizing their surnames in a misleading manner.  Finally, the law does not generally afford the

24

defendants an unlimited right to use their own surnames in business in the

circumstances of the case.  See McCarthy, Trademarks and Unfair Competition, §

13:17, 13-31 ("If a person whose surname has been legally adopted by a senior user,

then severs his ties with that company and goes into business for himself, he has no

unqualified right to use his own name, if the result is likelihood of confusion.")

Therefore, the defendants cannot be said to have a particular "right" to call themselves

"Suisman & Shapiro" stemming from the common custom of naming law firms after their

members.

> ### C)    Connecticut Trademark Statutory Claim

The plaintiff firm asserts causes of action under section 35-11i of the

Connecticut General Statutes for trademark infringement and trademark dilution.

Section 35-11i(a) provides a cause of action for injunctive relief against,

> any person who uses in Connecticut, without the consent of the registrant,
> any reproduction, counterfeit, copy or colorable imitation of a mark
> registered under this chapter in connection with the sale, offering for sale,
> distribution or advertising of any goods or services on or in connection
> with which such use is likely to cause confusion or to cause mistake or to
> deceive as to the source or origin of such goods or services. . . .

Conn.Gen.Stat. § 35-11i(a)(1).  The defendants do not dispute that, at the time of the

filing of the plaintiff's suit, the plaintiff had registered the mark "Suisman Shapiro" with

the Connecticut Secretary of State.  See Defs' Memo. in Opp., p. 16; Prelim. Inj. Hrg.,

Ex. 7.  The analysis of the preceding sections demonstrates that the plaintiff firm is

entitled to judgment as a matter of law under section 35-11i(a).  See Shop-Rite, 173

Conn at 268 (finding unfair competition claim also satisfies elements of claim under

section 35-11i(a)).[4]

**D)   CUTPA**

The plaintiff also asserts a cause of action under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. § 42-110a et seq.. CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn.Gen.Stat. § 42-110b. Courts in this district have held that a Lanham Act violation is an automatic CUTPA violation. Timex Corp. v. Stoller, 961 F.Supp. 374, 381 (D.Conn.,1997); Nabisco Brands, Inc. v. Kaye, 760 F.Supp. 25, 29 (D.Conn. 1991); Dial Corp. v. Manghnani Investment Corp., 659 F.Supp. 1230, 1239 (D.Conn.1987). In order to be a deceptive practice under CUTPA, three requirements must be met:

> [f]irst, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under the circumstances. Third, the misleading representation, omission, or practice must be material-that is, likely to affect consumer decisions or conduct.

Caldor, Inc. v. Heslin, 215 Conn. 590, 597 (1990)(internal quotation omitted). As demonstrated by the analysis above in connection with the defendants' Lanham Act violation, no genuine issue of material fact exists with regard to whether the defendants'

---

[4]The parties have also briefed the plaintiff's asserted claim under Conn.Gen.Stat. § 35-11i(c), the portion of the Connecticut trademark statute that addresses trademark dilution. Because the plaintiff claimed against the defendants generally under section 25-11i, and because the court finds that the plaintiff firm is entitled to judgment as a matter of law under section 35-11i(a), it does not address the merits of the plaintiff's claim under section 35-11i(c).

actions constitute a deceptive trade practice under these requirements.

In addition, a CUTPA plaintiff is required to demonstrate an ascertainable loss to prevail in a CUTPA action.  Conn.Gen.Stat. § 42-110g(a); Hinchliffe v. American Motors Corp., 184 Conn. 607, 615 (1981).  "'Ascertainable' means capable of being discovered, observed or established," and "'[l]oss' has been held synonymous with deprivation, detriment, and injury."  Hinchliffe, 184 Conn. at 814.  Loss of potential customers has been held to constitute ascertainable loss.  Service Road Corp. v. Quinn, 241 Conn. 630, 643-644 (1997).  The undisputed evidence of actual consumer confusion supports the inference that the plaintiff firm has suffered an ascertainable loss entitling it to relief under CUTPA.  See id. at 644 ("The fact that a plaintiff fails to prove a particular loss or the extent of the loss does not foreclose the plaintiff from obtaining injunctive relief and attorneys' fees pursuant to CUTPA if the plaintiff is able to prove by a preponderance of the evidence that an unfair trade practice has occurred and a reasonable inference can be drawn by the trier of fact that the unfair trade practice has resulted in a loss to the plaintiff.").   Summary judgment is therefore granted to the plaintiff firm on its CUTPA claim.

E)      Relief

In its motion for summary judgment, the plaintiff firm requests equitable relief in the form of a permanent injunction, nominal damages, and costs and attorneys' fees.[5]

---

[5] The court interprets the plaintiff's motion for summary judgment to abandon the claims for treble and punitive damages set forth in its complaint.

Injunctive relief is available to the plaintiff firm under both the Lanham Act, 15 U.S.C. § 1116, and under Conn. Gen. Stat. §§  35-11i(a) and 42-110g(a). "[T]o obtain a permanent injunction a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted."  N.Y. State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1362 (2d Cir. 1989)(citation omitted).  The harm threatened by the continued use of the infringing mark by the defendants constitutes irreparable harm.[6] Accordingly, the court's preliminary injunction order [Dkt. No 16]. is made permanent.

The court awards the plaintiff firm nominal damages in the amount of $1.00. "Nominal damages are recoverable where there is a breach of a legal duty or the invasion of a legal right and no actual damages result or where, as here, such damages are not proven."  Wasko v. Manella, 87 Conn.App. 390, 400 n.8 (Conn.App. 2005)(citing 22 Am.Jur.2d, Damages § 14 (2003)).  Nominal damages are also available under CUTPA and the Lanham Act.  15 U.S.C. §1117; Tang v. Bou-Fakhreddine, 75 Conn.App. 334, 340 (Conn.App. 2003).

Attorneys' fees and costs are available to the plaintiff firm under CUTPA. Conn.Gen.Stat. § 42-110g(d).  The plaintiff firm may move for such costs pursuant to Fed.R.Civ.P. 54(d)(2) and the local rules within 21 days of this ruling.

---

[6]The defendants' argument that the plaintiff is not entitled to injunctive relief because the plaintiff has unclean hands, having sought legal registration of the mark "Suisman Shapiro" after Joel Suisman stated his intention, sometime around 2001, of opening a law firm with the name "Suisman Shapiro," is without merit.  As the preceding analysis makes clear, the plaintiff firm was entitled to legally protect its mark, and its efforts to do so do not weigh against its claims.

**IV.     CONCLUSION**

For the foregoing reasons, the plaintiff's Summary Judgment Motion [Dkt. No. 37] is GRANTED.  Nominal damages are awarded to the plaintiff in the amount of $1.00.  Further, the court orders that the defendants, S. Joel Suisman and Andrew Shapiro:

1.     are each permanently enjoined from utilizing the name "Suisman & Shapiro," or any combination of Suisman followed by Shapiro joined by any connective such as ampersand, colon, slash mark, comma or symbol, or a spelling such as "and" (hereinafter collectively referred to as the "prohibited name"); and

2.     are each permanently enjoined from continuing to maintain a telephone listing under the prohibited name or from advertising the prohibited name or otherwise seeking to disseminate or use the prohibited name.

**SO ORDERED.**

Dated this 15th day of February, 2006, at Bridgeport, Connecticut.

/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge

29